**AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS (AFL–CIO), Appellants,**

v.

**FEDERAL ELECTION COMMISSION.**

No. 78–1937.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1979.

Decided April 1, 1980.

Rehearing Denied July 9, 1980.

Certiorari Denied Nov. 10, 1980. See 101 S.Ct. 397.

---

Laurence Gold, Washington, D. C., with whom J. Albert Wall, Washington, D. C., was on brief, for appellant.

Kathleen I. Perkins, Atty., Federal Election Commission, Washington, D. C., with whom William C. Oldaker, Gen. Counsel, Charles N. Steele, Associate Gen. Counsel and Barbara Van Gelder, Atty., Federal Election Commission, Washington, D. C., were on brief, for appellees.

Before ROBB and WALD, Circuit Judges, and NICHOLS *, Judge, United States Court of Claims.

Opinion for the Court filed by Judge NICHOLS.

NICHOLS, Judge:

This is an appeal by the American Federation of Labor and Council of Industrial Organizations (AFL–CIO) from an unreported order of the United States District Court for the District of Columbia issued on June 16, 1978. The AFL–CIO takes exception only to that portion of the order which assessed a civil penalty of $10,000 for violation of the Federal Election Campaign Act of 1971, *as amended*, 2 U.S.C. § 431 *et seq.* (Act). The alleged violation involved the transferring of funds between the Committee on Political Education-Political Contributions Committee (COPE–PCC) and the COPE Education Fund. The case was taken on a joint stipulation of facts.

The COPE Education Fund is financed by AFL–CIO general treasury monies derived from union dues and assessments. It is used for non-partisan voter registration, get-out-the-vote drives and communications with union members. COPE–PCC, on the other hand, is a separate segregated fund within the meaning of 2 U.S.C. § 441b and is permitted to make direct contributions to candidates for federal elective office. Its monies may not be derived from any source but wholly voluntary political contributions from AFL–CIO union members. 2 U.S.C. § 441b allows corporations and labor unions to have such "segregated" funds supported, in the case of unions, in no part by the required dues of members.

As had been a long-standing practice of the AFL–CIO, between 1970 and 1977 several times COPE–PCC transferred money to the COPE Education Fund for use by that fund. It was explained that COPE–PCC funds were idle and useless between elections. On demand of COPE–PCC, funds would be transferred from the Education Fund back to COPE–PCC for its use.

At no time did COPE–PCC owe money to the Education Fund: the assistance was entirely one-way. These transfers were designated as loans but were interest-free. Complete records were kept, and, with one relatively minor exception, the transactions were duly reported to the Office of Federal Elections of the General Accounting Office (GAO) and later to the Federal Elections Commission (FEC or Commission) to which jurisdiction was transferred. The FEC concedes that there was no intentional wrongdoing.

On November 7, 1974, the GAO issued a report of its Office of Federal Elections on the results of an audit of the AFL–CIO. The purpose of the audit was to review AFL–CIO compliance with the Act. The report noted that there had been a failure to report a transfer of $1,500 from COPE–PCC to the COPE Education Fund. The report went on to say that an amended report had been filed to correct the discrepancy and that no further action was recommended. Any reader aware that the transfer referred to was one of several would, we think, have concluded that if reported the transfers were not objectionable.

On August 23, 1977, the Federal Elections Commission, which had succeeded to the GAO's authority, notified the AFL–CIO that it was taking the position that while § 441b of the Act permits transfers of funds from COPE–PCC to the COPE Education Fund, no transfers back into COPE–PCC were permissible.

Following an FEC reaffirmance of its position, there was a period of attempted reconciliation as required by section 437g(a)(5)(A) of the Act. During this period the Commission rejected a proposed settlement which would have allowed a single transfer of $312,000 from the Education Fund to COPE–PCC for the purpose of clearing the balance between the two funds; the Education Fund holding at that time that sum of COPE–PCC funds.

■ The FEC brought an enforcement action in the District Court seeking a prohi-

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

bition against any future transfers from the COPE Education Fund to the COPE–PCC and the imposition of a civil penalty under section 437g(a)(7) of the Act. During the hearing on June 12, 1978, it was conceded by counsel for the Commission that "* * * we are not attributing a direct mal-feasance [sic] on the part of the AFL–CIO." No express provision violated by the transfers was pointed out and the transcribed remarks of the District Judge show he thought the wrong was principally to the political contributors, not the regular dues payers, and was in the nature of a breach of trust. We agree with the District Judge that under the law no part of the monies of a union's segregated political fund should be co-mingled with regular dues money, even temporarily, but the statute is not specific as to what is to be segregated from what. The conclusion is a matter of reading the statute in light of the common law rather than direct statement, but it is not challenged here, as it was below. The class the statute was written to protect clearly was the regular dues payers, not the political contributors, and in view of the obviousness of this, the error of the appellant, though an error, still is, understandable.

At the close of the hearing, the District Court stated the terms of its order from the bench. The order was filed in final written form on June 16, 1978. It declared the transfers to be in violation of 2 U.S.C. § 441b and prohibited future transfers from the general treasury or the Education Fund to COPE–PCC with a single exception; a clearing of the $312,000 balance of COPE–PCC monies back to COPE–PCC from the Education Fund was ordered. Finally, the District Court ordered the imposition of a civil penalty of $10,000 against the AFL–CIO. As previously noted, only the imposition of the civil penalty is now at issue. We reverse.

While the transcript of the hearing reflects the civil penalty was assessed pursuant to 2 U.S.C. § 437g(a)(7), the final order cited 2 U.S.C. § 437g(a)(1)(7) which would not accurately refer to any section of the Act. We therefore take the citation in the transcript as correct.

■ While we agree with appellee that the District Court is vested with discretionary authority in the imposition of civil penalties, the exercise of that discretion is subject to appellate review. Such discretionary exercises must be "guided by sound legal principles." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975).

■ We turn to the question of whether the imposition of a $10,000 civil penalty under 2 U.S.C. § 437g(a)(7) is supported by the facts of this case. Under that section it must be found that there was "clear and convincing" evidence that the violation was "knowing and willful." Where such a finding is made, a civil penalty of not more than the greater of $10,000 or 200 percent of the amount of money involved in the violation may be imposed. In the context of this case and the statutory framework, it is clear that a "knowing and willful" violation must be something more than is present here. As will appear, another section deals with penalties for violations not specified to be willful. The distinction is a real one the trier of fact must contend with, we think, if he means to find willfulness. The order should have addressed the question, but we do not dispose of the case on that ground as it was not briefed.

In the case of *Frank Irey, Jr., Inc. v. Occupational Safety and Health Review Commission*, 519 F.2d 1200 (1975),[1] the Third Circuit faced a similar issue where the Occupational Safety and Health Act provided for three levels of civil penalties for "non-serious," "serious," and "willful" violations. The penalty for a "non-serious" violation was a discretionary fine of up to $1,000. For a "serious" violation a mandatory fine of up to $1,000 was provided. A "willful" or repeated violation could bring a fine of up to $10,000. The hearing officer

---

1. *Reh. en banc*, 519 F.2d 1215, *cert. granted, Atlas Roofing Co. v Occupational Safety and Health Review Commission*, 424 U.S. 964, 96 S.Ct. 1458, 47 L.Ed.2d 731, *aff'd*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

had found a "willful" violation in the employer's failure to adequately assess a certain safety risk. On appeal from the Commission's affirmance of the hearing officer's decision, the court decided that the hearing officer had found facts sufficient only to support a finding of a "serious" violation. Given the statutory context, a "willful" violation must necessarily connote "defiance or such reckless disregard of the consequences as to be equivalent to a knowing, conscious, and deliberate flaunting of the Act." To hold otherwise would fail to distinguish between a "serious" offense and a "willful" one and would "disrupt the gradations of penalties" established by Congress. *Frank Irey Jr., Inc.* at 1207.

In our case there is not only no finding but also no evidence of such "defiance" or "knowing, conscious, and deliberate flaunting" of the Act. In fact, every indication is that the AFL–CIO considered itself to be in compliance with the Act. It learned nothing to the contrary from the GAO upon the occasion of the latter's audit. The fact that the AFL–CIO was routinely reporting the inter-fund transfers to the very agency charged with enforcement of the Act is persuasive evidence of a lack of intent to violate the Act's prohibitions. The Commission would seem to have conceded this point in stating at the District Court hearing that "the Commission must reiterate we are not attributing a direct mal-feasance [sic] on the part of the AFL–CIO." Appendix at 68a.

In addition to a lack of evidence that the AFL–CIO acted otherwise than in good faith, we can not say that their belief in the legitimacy of the inter-fund transfers was unreasonable. Neither the Act nor any court decision had addressed the immediate issue. Most telling is the fact that the audit by the Office of Federal Elections of the GAO, two years after the decision in *Pipefitters Local No. 562 v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) had noted the transfers and did not indicate disapproval in any way. It is clear that uncertainty as to the meaning of the law can be considered in assessing the element of willfulness in a violation of the

law. *See James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), *United States v. Garber*, 607 F.2d 92 (5th Cir. 1979).

The *Garber* case was a criminal tax prosecution where, as here, willfulness was, by express command of the statute, an element of the offense. The holding (en banc, with four dissents) was that it was reversible error to exclude testimony by experts tending to show that the rightness or wrongness of defendant's reporting of the involved income was uncertain. The court said that no one should be convicted on the basis of an interpretation of law that is so written as to be of uncertain meaning to the mind of the accused. We do not have before us the question whether an uncertainty of law can be shown by witnesses. We think it is obvious that in construction of any penal statute of which willfulness is an element, it is possible for the meaning of the statute to be clear to the mind of a trained judge, and still be less than clear enough to support a finding of willful violation. This is certainly so where, as here, the question whether the conduct of the AFL–CIO was unlawful, was hitherto untested by any sort of tribunal, and there was no regulation or even press release by the Commission, so far as cited to us.

Contrary to the Commission's assertions, we do not regard the Supreme Court's decision in *Pipefitters* as providing specific notice that the inter-fund transfers involved herein were prohibited by the Act. In that case, the appeal of a conviction for campaign violations under the law as it was before the Federal Election Campaign Act of 1971, the central issue was whether union control of political action committee (PAC) funds was prohibited. The Supreme Court rejected the prosecution's contention that PAC's must be independent of control by union officials. By way of limiting the scope of its holding, the Court stated that "a fund must be separate from the sponsoring union only in the sense that there must be strict segregation of its monies from union dues and assessments." *Pipefitters* 407 U.S. at 414, 92 S.Ct. at 2264. At 422, 92

S.Ct. at 2268 the Court states that " 'separate' is synonymous with 'segregated.' " At 428–432, 92 S.Ct. at 2271–2272 there is extensive material on the meaning of "segregated," but it deals with whether the term bars union officials paid by union dues, and using union financed offices, from managing political funds. The holding is that it does not. Some readers of *Pipefitters* might have advised caution in doing what was done here, but others might have said that, if carefully accounted for, loans by the political fund to the regular fund financed by dues were not inconsistent with the funds being "separate" and therefore not in conflict with the requirement of "segregation." The truth is that the Court did not have before it the issue we must decide here, and the issues it did decide are not here raised.

In all events the facts of this case do not support a finding that the violations were "knowing and willful" as required by 2 U.S.C. § 437g(a)(7), the provision upon which the District Court based the imposition of the civil penalty.

As noted above, the Act also provides for the imposition of a civil penalty under section 437g(a)(5)(C). That section provides for a lesser penalty upon a finding of a violation of the Act and does not expressly require that the violation be "knowing and willful." We do not reach the question of whether a penalty could have been imposed in this case under that section. The complaint did not seek a penalty thereunder, the parties did not brief the issue, and the District Court did not consider it.

As a matter of fact, the penalty was imposed without any discussion at all; the entire oral argument before the District Judge dealing with the attempt of the Commission to remove the $312,000 permanently from the uses for which it had been donated. There was no attempt at conciliation on the Commission's part except on the inadmissible premise that the breach of trust it had discovered should not be corrected. We believe the refund of $312,000 ordered by the court was properly to be characterized as a correction of a mistake.

That is what we have here, a breach of law by mistake, not by willful wrong.

Had the AFL–CIO been intransigent after learning of the Commission's position on the transfers, we might have reached a different result. In fact, the AFL–CIO was willing during the conciliation period to accede to the Commission's position prospectively. It was the Commission's insistence on prohibiting the clearing of the balance between the funds that stymied the conciliation efforts.

Accordingly, the order of the District Court is modified by vacating the portion that assesses a penalty of $10,000. The remainder of the order is not appealed from and disposes of the case.